Eurus Kelly WATERS, Petitioner–Appellant,

v.

Walter ZANT, Warden Georgia Diagnostic and Classification Center, Respondent–Appellee.

No. 88–8935.

United States Court of Appeals, Eleventh Circuit.

Dec. 9, 1992.

James M. Doyle, Deputy Chief Counsel, Public Counsel, Div., The Com. Mass., Committee for Public Counsel Services, Boston,

Mass., Wade W. Herring, II, Savannah, Ga., for petitioner-appellant.

Paula Smith, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before TJOFLAT, Chief Judge, HATCHETT, Circuit Judge, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

Eurus Kelly Waters appeals the district court's denial of his petition for habeas corpus. In that petition, Waters alleged multiple grounds for relief from the convictions and sentence of death imposed on him by the State of Georgia. In this court, Waters presents eight grounds for relief.[1] We affirm the district court's decision to deny the writ as to Waters' convictions; however, because we find that Waters received ineffective assistance of counsel in the sentencing phase of his trial, we reverse the district court's decision to deny the writ as to the sentence of death.

## I. BACKGROUND

The facts concerning the murders and Waters' arrest are not in dispute. The following excerpt is taken from the opinion of the Georgia Supreme Court:

At 4:33 P.M. on Friday, April 25, 1980, EMT's (Emergency Medical Technicians) with the Jekyll Island Fire Department received a call reporting a shooting at a Phillips 66 station on Jekyll Island. When they arrived at the station, Kathryn Culpepper was sitting in a red AMC Gremlin automobile. She had a gunshot entry wound in her chest and an exit wound in the area of her left kidney.

A pair of handcuffs was fastened to her left wrist....

A state trooper who had also responded to the call asked Ms. Culpepper what had happened. She told him that while she and a girlfriend had been fishing, a white male had pulled a gun on them, made them march into the woods, handcuffed them, sexually assaulted her, and then shot both of them. She thought the other woman was dead.

The body of the other woman, Anita Paseur, was found approximately two miles south of the Phillips 66 station in what is known as the New Marina area of Jekyll Island. She was lying on her back, clothed from the waist up, with her bathing suit bottom and shorts pulled down to her ankles. She had a bullet wound in the upper left part of her chest. A later autopsy showed that Ms. Paseur's death resulted from the gunshot wound. A .38 caliber bullet was removed from her during the autopsy. A [Georgia Bureau of Investigation ("GBI") agent,] using a metal detector at the crime scene, found another .38 caliber bullet under some leaves about 10 feet from where Ms. Paseur had been found.

GBI agent Scott Curley talked to Ms. Culpepper in the hospital. He obtained a description of the killer, his car, his gun and holster, and Ms. Culpepper's missing pocketbook. Agent Curley then posted a lookout for a white male in his late thirties, of average height, with light brown hair and light blue eyes, having a country accent, and wearing a light blue shirt, dark blue pants and black shoes; for an older model white, 4-door Pontiac or Buick automobile with a Georgia tag; for a .38 or .357 police-type revolver; for a

---

1. Waters argues that the district court erred in concluding that (1) he received effective assistance of counsel; (2) he was precluded from challenging the admissibility of his confession based upon the fourth amendment; (3) he was capable of validly waiving his fifth and sixth amendment rights in connection with his confession and claim of insanity at trial; (4) the failure of the state trial court to order a change in venue did not violate due process; (5) the jury's instructions on malice did not shift the burden of proof; (6) the failure of the trial court to charge the jury on manslaughter did not violate the eighth amendment; and (7) the instructions to the jury on the role of mitigating circumstances did not violate the eighth amendment. Finally, Waters argues that the district court erred in failing to hold an evidentiary hearing on several of these claims. While we have considered all of Waters' claims, only the allegations of ineffective assistance of counsel merit an extended discussion.

black leather holster; and for a burgundy colored, John Romain shoulder bag containing personal items belonging to Kathryn Culpepper.

Kathryn Culpepper died April 30. The cause of her death was excessive fluid around the heart and the pericardium, caused by the trauma directly beneath her heart, in the liver and pancreas, which in turn was caused by the bullet wound.

Eurus Kelly Waters was a cab driver in Waycross. He worked half a day Wednesday, April 23 and Thursday, April 24. He did not work at all on Friday.

Dorothy Googe was lying by herself on the beach at Jekyll Island early Friday afternoon. A fully dressed man, wearing long, dark pants, a blue shirt, and black shoes, walked by her toward the picnic area.... Ms. Googe later identified Waters, by means of a photographic lineup, as the man on the beach.

Between 4:30 and 5:00 P.M. Friday, Brantley County Deputy Sheriff Jerry Rowell was travelling west on Highway 84. As he came over the top of the Satilla River Bridge, he had to slow down to 20 miles per hour behind a white 4-door 1974 Chevrolet. After following the car for a while, Deputy Rowell, suspecting the driver was intoxicated, stopped the car. When the driver opened his door, Rowell saw a Motorola police-type radio on the transmission hump and asked the driver if he worked for a timber company. The driver told him no, he was a part-time cab driver in Waycross. Deputy Rowell decided the driver was not intoxicated and let him proceed. He later identified Waters, by means of a photographic lineup, as the driver of the car.

On the afternoon of Thursday, May 1, 1980, Ms. Culpepper's burgundy colored, John Romain shoulder bag, containing various credit cards but no cash, was found on the west bank of the Satilla River just under the Satilla River Bridge. The Satilla River Bridge is 33.2 miles from the New Marina area of Jekyll Island.

Waters told his wife, Helen, when he got home the evening of the 25th that he was late because he had got stuck in the swamp. He went back to work Saturday. Next Tuesday, April 29, Helen Waters read an article in the paper about the murders on Jekyll Island. The article gave a description of the suspect. She turned to her husband and said, "Kelly, this murder, these things that's happened on Jekyll Island, this description fits you." Waters looked at her for a few seconds and then said, "call Judy." When Judy Petty, Waters' sister, arrived, Waters started crying and said, "Sister, I think I may have killed some people. If I have done this thing, I want to die." He continued crying for most of the rest of the evening. Ms. Waters got her husband's gun, which was fully loaded, out of the bedroom dresser and hid it under the sink.... After some discussion, the family decided not to call the police at that time; Ms. Petty would try to get in touch with a friend of hers, Ed Dixon, a Glynn County policeman, and ask him what to do.

Waters and his wife spent Tuesday night with Judy Petty in Brunswick. The next morning, the three of them went to the mental health clinic in Waycross that had been treating Waters since 1978. He was given a shot of Prolixin Decanoate, a long term major tranquilizer.

Ms. Petty finally reached Ed Dixon Saturday, May 3. Sunday afternoon, Waters' pistol was given to Dixon, who turned it over to GBI agent Curley. Monday afternoon Agent Curley and Detective Wofford went to the Waters' residence in Waycross and asked Waters to accompany them to the State Patrol station in Waycross, two or three miles from Waters' house. There, after advising Waters of his rights, Agent Curley interrogated him. Waters said he couldn't really remember what he had done Friday afternoon but thought he may have got stuck in a swamp. He remembered that he had been wearing a light blue shirt, dark blue trousers and black boots. He admitted owning the .38

caliber pistol that had been given to Agent Curley. He admitted owning a black leather holster and a pair of handcuffs, but he couldn't remember where the cuffs were. He agreed to go back to the house to allow Agent Curley to look at the clothes, the holster and the ammunition for the gun.

They went back to Waters' house. Helen Waters got the ammunition and the holster and gave them to Agent Curley. Waters retrieved a light blue shirt and dark blue pants that he identified as being the ones worn by him on April 25th. At 4:15 P.M., Monday, May 5, 1980, Waters was placed under arrest.[2]

After Waters was placed under arrest, he was taken to the Liberty County Georgia Jail. On May 7, 1980, agent Curley appeared before Deputy Magistrate Charles Moore and obtained two warrants for Waters' arrest. Waters was not present when this warrant was obtained. Later that day, Waters was taken before Glynn County Magistrate Grimes for the "committal hearing" required under Georgia law when a person is arrested without a warrant. Waters was not represented by counsel at this hearing. However, no witnesses testified; Waters merely was apprised of his rights and the charges pending against him. At the conclusion of this hearing, Waters was taken back to the Liberty County Jail where he was questioned after again being informed of his rights. At this time he confessed to the murders.

After Waters confessed, John W. Davis, the Glynn County Public Defender, and Don Manning, an assistant public defender, were appointed to defend Waters. Al-though Davis had more than 15 years of experience as a practicing attorney, he had gained most of this experience prior to 1955, having spent from 1955–61 as a judge and from 1961–76 as a congressman in Washington. At the time he was appointed to represent Waters, Davis had been the Public Defender for less than a year, and he had last been involved in a capital case sometime prior to 1961, more than 20 years before Waters' case was tried.[3]

Davis and Manning met with Waters several times during the course of their pre-trial investigation. After investigating Waters' mental history, Davis decided to pursue an insanity defense. However, none of the professionals who had examined Waters were willing to testify that he met the Georgia definition of insanity. Davis testified at the state habeas proceeding that, although the public defenders' office had available funds to hire an independent psychiatrist, he was unable to find one willing to enter the case.

From the investigation Davis did conduct, it was evident that Waters was suffering from a mental illness. Waters had attempted suicide on two previous occasions. He had been diagnosed as suffering from paranoid schizophrenia. This illness made it likely that he would suffer from delusions and hallucinations. His medical records indicated that his mood changed often and suddenly. Waters' mood swung from periods of happiness to periods of depression to periods of aggressive behavior. Prior to the murders, Waters was being treated by the use of the drug Mellaril, which is an anti-psychotic drug used to control feelings of anger and hostility by

---

2. *Waters v. State,* 248 Ga. 355, 283 S.E.2d 238, 241–43 (1981) (footnotes omitted), *cert. denied,* 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1398 (1983).

3. The state court in Waters' state habeas proceeding found that "in [Davis'] three and a half years with the Public Defender's Office, he had defended 'a number of capital felonies' before Petitioner's trial.' " Respondent's Exh. 3E at 2. Having reviewed the transcript of the state habeas proceeding, we conclude that the state court's finding is not "fairly supported by the record" and, therefore, is not entitled to a pre-sumption of correctness. *See* 28 U.S.C. § 2254(d). Davis testified at the state habeas proceeding that he became the Public Defender in December 1979, Respondent's Exh. 3B at 34, approximately 13 months before Waters was tried in January 1981. Although Davis did testify that he had defended "a number of capital felonies," *id.* at 35, he later clarified that he defended these capital felonies before he became a judge in 1955; he unequivocally testified that, prior to Waters' trial, his last involvement in a capital case was as a presiding judge sometime before 1961. *Id.* at 67.

patients with schizophrenia. As long as Waters took the medicine, the treatment was successful. A few weeks prior to the murder, however, Waters had ceased taking his medicine.

Davis made two pretrial motions. First, he moved for a change of venue based upon the publicity the case had generated. After holding a hearing, the trial court denied the motion. The court did, however, grant the motion for individually sequestered voir dire. In addition, Davis challenged the admissibility of Waters' confession on fifth and sixth amendment grounds. Although Waters claimed to have asked for an attorney before confessing to the murders, both of the investigators who were present at the time of the confession denied that Waters had made such a request. After holding a hearing, the trial court refused to exclude the confession.

Even though Davis could find no expert willing to testify that Waters met the test for insanity in Georgia, Davis determined that insanity would be his defense at trial. At the state habeas proceeding, Davis conceded that he did not expect the jury to return a not guilty verdict based on the insanity defense; rather, he hoped to use the insanity defense to save Waters' life:

> Q: And is it fair to say that by the time you got to the trial you felt that you were trying the case to save this man's life rather than to get a not guilty verdict?
>
> A: That's correct.
>
> Q: Is it fair to say that you didn't expect to succeed on an insanity defense?
>
> A: I expected—as a lawyer, as a realistic lawyer, I hoped that the matter of his competence would result in a verdict of a life sentence and not of a death sentence.[4]

Manning's recollection is consistent with that of Davis on this point. He testified:

> Q: If we could move now to the sentencing phase of the trial, if you could describe to the Court any effort to prepare for the sentencing phase.
>
> A: Well, we really didn't have any special preparation for that phase. We—knowing the facts of the case it appeared that Mr. Waters probably would be found guilty based upon his testimony and other evidence. So we considered the totality of the trial. We didn't think well, let's talk about the guilt/innocence phase versus let's talk about the penalty phase. We viewed it as a whole and approached the trial from that standpoint. And we felt that any witnesses that we put up during the guilt/innocence phase, their testimony would be essentially the same in that phase as it would be in the penalty phase. So if we got the testimony in or attempted or tried to in the guilt/innocence, we felt it just be redundant to call those same, very same, witnesses in the penalty case. So we did not call any witnesses in the penalty phase.[5]

Thus, counsels' stated strategy was to present by means of the insanity defense a case for mercy during the guilt-innocence phase of the trial.

In his opening statement at trial, Davis conceded that Waters had committed the killings. After the state rested its case, Davis called to the stand six medical experts. None of these experts testified that Waters met the test for insanity in Georgia, that is, none of them testified that Waters did not know the difference between right and wrong; in fact, four of the experts testified on cross-examination that Waters did know right from wrong. Nevertheless, several of the experts did offer testimony that could have been helpful to a plea for mercy. For example, one expert testified that Waters suffered from a "mental disorder" and "acted like a schizophrenia, paranoid type."[6] Several experts testified that Waters had been treated with Mellaril, which one expert described as "a major tranquilizer, antipsychotic drug;"[7] she further explained that psychosis is a

---

**4.** Respondent's Exh. 3B at 50–51.

**5.** *Id.* at 74–75.

**6.** Respondent's Exh. 1F at 951.

**7.** *Id.* at 915.

"state of mind other than reality." [8] Another expert testified that Waters had stopped taking Mellaril a few weeks before the killings,[9] and yet another testified that without this medication Waters could have a "real acute, psychotic brain." [10]

Several of these experts also, however, offered testimony that was very harmful to a case for mercy. Almost without exception, this harmful testimony was elicited by *Davis during his direct examination.* For example, in the redirect examination of Dr. Miguel Bosch, Davis first elicited from Dr. Bosch his opinion that there was no connection between Waters' mental illness and the crime. Then, notwithstanding Dr. Bosch's protestations, Davis elicited from him most unfavorable testimony regarding the specifics of the killings and his opinion as to the "key" to the crime: "[Waters] wanted to have sex." We reproduce here the bulk of Dr. Bosch's testimony on redirect examination:

A [by Dr. Bosch]: ... As far as the question of his condition at the time of the alleged offense, I dealt with that many times in trying to figure out what was wrong, and I could not put it together, the crime and the mental illness. You know, you're talking about insanity. You're talking about right from wrong and from delusional compulsions, but when we do this kind of work, when we see these people and talk to them and see the crime that they committed, the question that we ask in ourselves, is this connected with this illness, is this a result of this illness.

Q: Well, what's your answer to that?

A: And my—And I couldn't find any connection. That's the reason that I stated to the District Attorney that it is my opinion that at the time of the offense, at the time of the alleged murder that he knew what he was doing.

Q: Well, let me ask you this: How do you reconstruct the feeling of the emotion that Kelly Waters felt at the time

the crime was committed? How do you, in your mind, reconstruct that?

A: I would like to answer the question, but not with the jury present.

Q: Well, we—You will have to ... defer to our wishes in the matter. I asked you to answer it.

A: ... To answer the question, I would have to get into the, what I consider as, I don't know, it's confidential between me and your client, and the Defendant. And I would have to say something that, what he said to me and I don't know if I should say that in front of the ladies and gentlemen or not. I have some doubt about it.

A: Well, You Honor, do I have to answer the question? Do I have the right to refuse to answer his questions? ... Your Honor, this is my point: I do have—I can answer his question. I do have the answer. There's no question about it. I can answer his question and hope that he'd be satisfied, but based on my confidential relationship between me and Mr. Waters, I prefer not to answer that question. But I do have the answer. If you ask me to give it to him, I will do it.

THE COURT: Well,

MR. DAVIS: Your Honor, we ask that he give it.

THE COURT: All right. All right. He has waived his privilege, Dr. Bosch.

A: Well, Mr. Davis, this is the answer to your question, and I wrote it down.

Q: All right.

A: It's not something that I'm saying to you today. Now, this is related to the alleged offense. He related to me that he went from Waycross to Brunswick, that he saw two women fishing in that area over there. That he saw the women were getting ready to leave, that he had a gun in his car, that he pulled the gun

---

8. *Id.*

9. *Id.* at 939.

10. *Id.* at 980.

on those women. And he has stated to me that the reason that he did it was because he wanted to have sex with them, but he could not have sex with them. And he said that he had oral sex with one of the women.

Q: You're saying oral?

A: Oral, yes.

Q: All right.

A: He said that he put the the handcuffs on both of them, and I believe on the left and right side of the other one, and then he said that after that—He said that he put the handcuffs on the ladies because they were trying to over power him. And then he shot the older lady, and then he shot the second one, the other one. And then he left, went back to Waycross. He said that he was stopped by a deputy or a state patrol on the road, who checked on him to see if he was drinking, and they let him go. And then later on he got back home. That's what he said to me about the alleged offense.

Q: Yes. Well, I don't object to your reading that. I'm quite happy to have it in the record, but my question didn't quite address that point. My question is: How do you reconstruct the emotional processes that lead to that act that you've just read about?

A: I mean, you—I believe that I got an idea what you're trying to, what you're looking for. You're trying to, asking me how I was able to give an opinion about that he was not ...

Q: No, I'm not trying to work my way back to anything. I'm just saying,—Awhile ago, for example, you were describing the emotional processes that led to his attempted suicide.

A: Yeah.

Q: Now, I'm trying to ask you to give us your opinion of the emotional processes that led to the event you just read about.

A: Well, most likely, he was in a kind of stage, or emotional condition, more or less, like I saw him in the Liberty County Jail. Maybe he was a little bit tense or a little bit depressed. He had a few drinks

on that date. And that he was, maybe like he was going to, when I talked to him, that he was able to relate, able to talk, that he understood my questions and ...

Q: I'm talking about on April the 25th.

A: Yeah, that's what I said. And I'm sure that his emotional state, whatever he worries about, being maybe a little bit apprehensive, a little bit nervous, a little bit depressed on that date, and because of all of this background that he had, maybe after the first lady, the oldest lady got shot, between that one and the second one, maybe he got a little more apprehensive or a little more fears about what was going on and more, you might say, tight, emotional state, between the shooting between the two ladies, and plus, I'm sure that after the whole incident that, the whole incident, maybe he got a little more tight, a little more upset. And I don't know if that takes care of your question.

Q: No, it doesn't. What I'm driving at is, what—Do you think that the whole episode was trying to do something for his own ego or some other reason?

A: My feeling is like I wrote, and I believe that, like I said before, he seemed to be honest with me when he answered my questions. And one of the—I believe the key to the whole thing is that he wanted to have sex. You know, when you drink—Alcohol, like I said, is a sedative. But, you know, alcohol relieves the sexual desire, but take away the performance. When people are drunk—When people drink, they want to have sex, but alcohol takes away the performance from them, and that was the case in this one, was a little bit of sexual impulse was released, but couldn't perform. And this is related to alcohol. But I believe the main reason, when he saw those two women, that he had some kind of sexual stimulus that he wanted to have sex with. And to me, that's what the key of the whole thing. And again, the episode when one of the women was trying to overpower him and—That's what he said. And again, I believe what he said.

Mr. Davis: I have no further questions.[11]

Immediately after this unfavorable testimony from Dr. Bosch, Davis called to the stand Dr. Hosea DeLatorre. We reproduce here Davis' entire direct examination of Dr. DeLatorre, with the exception of his professional background:

Q: All right. I'll ask you if you had occasion to examine the Defendant in this case, Kelly Waters, in the past?

A: That's correct.

Q: Can you state what date you examined him?

A: I saw him the first time the date that he was admitted to the Forensic Services Division in August the 21st, 1980.

Q: And then did you see him more than that one time?

A: I saw him on rounds, mostly once a week, and also, I saw him when he was at Stafford for competent, to decide he was competent to stand trial when he was released from the Binion building.

Q: And over what period of time did you see him once a week?

A: For about a month.

Q: So you saw him approximately four times?

A: Four times in one round, and I got two or three interviews with him.

Q: During the course of those interviews, were you able to form a medical opinion as to his mental condition?

A: Uh ...

Q: Just answer it if you were able ...

A: I got an opinion.

Q: Did you consult his records to find that he had been diagnosed as a paranoid type schizophrenic?

A: I got some information that he was diagnosed as a paranoid schizophrenic.

Q: Did you concur in that diagnosis?

A: No, sir.

Q: You did not?

A: No, sir.

Q: What was your diagnosis?

A: My diagnosis was anxiety neurosis.

Q: What kind of neurosis?

A: It's a neurosis characterized by the feelings of anxiety and ...

Q: I'm not understanding that word.

A: Feelings of anxiety.

Q: Would you ...

A: ... all the time, nervous, tense.

Q: One of your words was anxiety?

A: Anxiety.

Q: And what's the first part of that?

A: Anxious, neurosis, anxiety neurosis.

Q: Anxiety neurosis?

A: Neurosis.

Q: And that was your diagnosis?

A: That was my diagnosis. No, it was not my diagnosis. I was agree with the diagnosis, but the diagnosis was done by a psychiatrist the Binion Building, that he was assigned to a psychiatrist for mental evaluation. He made the diagnosis. And I, as the medical director of the Forensic Division, I need to check, I review all the diagnoses in the Forensic Service Division to see if they are correct. So we make another type of evaluation to see if we are agreed with the diagnoses offered by the psychiatrist before sending the people to the court.

Q: And you disagreed?

A: I was agreed with the diagnosis of anxiety neurosis done in the Binion Building.

Q: You are agreeing with anxiety neurosis?

A: That's correct.

Q: Would you explain to the jury how an anxiety neurosis differs from a schizophrenic condition?

A: The anxiety neurosis, the people in anxiety, when the person feels anxious, there's not too much difference with the schizophrenia.

Q: There's not much difference.

A: Not much difference because the people that feel anxious react different than normal people, exaggerate his actions, become violent at times. At times

11. *Id.* at 1002–11.

he feels depressed. It's mixed symptoms of different types of mental illnesses, but the person always is in good contact with reality.

Q: All right.

Mr. Davis: I have no further questions.[12]

The prosecution, of course, focused the jury on Dr. DeLatorre's testimony that Waters was in "good contact with reality":

Q [by the prosecutor]: Dr. DeLatorre, did I understand you to say that you found that Kelly Waters was in good contact with reality?

A: That's correct.[13]

Thus, in his entire redirect examination of Dr. Bosch and his entire direct examination of Dr. DeLatorre, Davis elicited only information *harmful* to the case for mercy for his client.[14]

Moreover, Davis failed to elicit from these medical experts much information that would have been helpful to the case for mercy. Three of the six experts who testified at trial submitted affidavits at Waters' state habeas proceeding attesting that Davis never discussed with them the possibility of testifying during the penalty phase of trial. These affidavits clearly indicate that these three experts did not understand Davis' purported strategy of presenting all evidence, including that relevant to sentencing, during the guilt/innocence phase of the trial. For example, the affidavit of the psychologist who testified at trial states:

If I had been called as a mitigating witness on Mr. Waters' behalf I could have offered the following testimony. I believe that although Mr. Waters did have the capacity to distinguish right from wrong, he was a deeply troubled man. I know that different people of-

fered different diagnosis in his case. At least one diagnosis held that Mr. Waters suffered from schizophrenia, a major psychiatric disorder. Whatever the correct specific diagnosis, however, the nature of Mr. Waters' illness was such that I believed it would have affected his conduct on Jekyll Island on the day of the murders. In my opinion, during that period Mr. Waters' thinking would have been characterized by paranoid illness. It would be consistent with what I know of his condition for him to have been hallucinating. Similarly, it would have been consistent with his condition for him to have been having difficulties in perceiving reality and for his judgment to have been impaired.

In my extensive study of Mr. Waters' record, and in my careful interviews of Mr. Waters, I discovered nothing which would lead me to believe that he was prone to direct violence against other people. It would be a fair characterization of his conduct on Jekyll Island (if indeed he did commit the murders) that it was an appreration response to a stressful situation. That response is not justified or excused by Mr. Waters' mental illness; it may well have been influenced by it.[15]

Even Dr. Bosch would have offered helpful testimony at trial had Davis elicited it. His affidavit filed with the state court states:

Mr. Waters' attorney never discussed with me the possibility of my testifying during the penalty phase of his trial. If I had been asked to testify at that time, I would have said that Mr. Waters was suffering from a serious mental disorder that is called schizophrenic disorder which should be considered a strong mitigating factor. Furthermore, during my evaluation sessions with Mr. Waters, he

---

12. Respondent's Exh. 1G at 1013–1016.

13. *Id.* at 1016.

14. Notwithstanding that Davis testified at the state habeas proceeding that he had interviewed some of the medical experts prior to trial, it is obvious from the testimony quoted above that Davis had no idea what the testimony of the experts would be. That Davis' interviews were

less than adequate is bourn out by the evidence offered at the state habeas proceeding. Although Davis specifically testified at that proceeding that he "talked with Dr. Bosch" prior to the trial, Respondent's Exh. 3B at 37, Dr. Bosch offered an affidavit attesting that Davis "did not directly discuss my testimony with me before I testified." *Id.* at 111.

15. Respondent's Exh. 3B at 115–16.

was always real polite and cooperative. Also, it was my feeling that Mr. Waters' personality does not reflect him having a criminal type personality. It was therefore quite a surprise to me that he was facing two counts of murder.[16]

Other than the diagnosis of schizophrenia, Davis did not elicit *any* of this helpful information at trial.

After the six medical experts had testified, Davis called to the stand Waters' three sisters. Davis asked one sister only about her endeavors to have certified certain medical documents. He asked the other two sisters only about the events leading up to Waters' arrest. Davis did not elicit from any of the sisters any testimony even touching upon Waters' character, his troubled childhood, his history of mental illness, or his history of attempted suicides. As is evident from the evidence offered at Waters' state habeas proceeding, the sisters were ready and willing to offer testimony on each of these subjects. For example, one sister attests that she and her siblings had a troubled childhood due to their father's drinking problem:

> One example of this happened one night when Momma came home late. She had been visiting the neighbor's whose husband died. Daddy got home about five minutes after Momma did. When he saw that dinner wasn't ready he got mad. Then he started drinking. After Momma had finished cooking dinner and had put it up on the table Daddy went over and picked up the food off the table and heaved it out the back door. He then went into the bedroom where Kelly was. He loaded his automatic shotgun. I said to Momma, "Daddy's getting the gun!" Momma grabbed me and my sisters and we all ran out the back door and across the woods. Daddy was yelling after us, saying he was going to shoot all of us. He did shoot at us once as we were running. We spent the night at a neighbor's house.

16. *Id.* at 111–12.

17. *Id.* at 121–22.

18. *Id.* at 125–27.

Kelly was 14 years old when our mother died..... [17]

Another sister attests:

> My brother has had a problem since he was a child with trying to make people look up to him. It's like 'spells' that come over him in which he would tell anything, true or not, to impress someone. During these times he would be argumentative if challenged on the truth of the issue and defend his words as though he believed them to be the absolute truth. We soon learned that it was useless to argue with him at these times, knowing that as soon as the 'spell' passed, he would be back to his old self. He has never, so long as I have known him, ever struck out at anyone or tried to hurt anyone, even at times when it would have been understandable to do so.

> Kelly shot himself shortly after our Daddy died and his first wife left him with their baby. He was very depressed. After he got well, and for the next few years, he believed he was unable to hold a job and through the Rehabilitation Program, we sent him to Augusta and to Milledgeville for evaluations. He went voluntarily. During these years he was frequently in one of his 'spells'....

> Before I left Waycross in 1979, I knew [Kelly] was having trouble with the spells again. I saw Kelly the weekend before the shooting.... I know he was in one of his spells because his eyes were bright and glassy looking as they are during these times.[18]

The third sister also attests that Waters "has never shown any violence to anyone in my presence." None of this favorable information was elicited at trial.

After Waters' sisters testified, Davis called to the stand Waters' wife. Like his sisters, she testified only to the events leading up to Waters' arrest; she offered no insight into his character or his history of mental illness.[19] Davis then put Waters

19. To the extent Waters' wife offered information beyond that relevant to the events about which she was questioned, it was harmful to Waters, indicating that she was ill-prepared to

on the stand. We reproduce here Davis' entire direct examination of Waters:

Q: Your name is Eurus Kelly Waters?

A: Yes sir.

Q: Mr. Waters, until the time of your arrest, you lived with your wife in Waycross?

A: Yes, sir.

Q: Was that at 708 Homer Street in Waycross?

A: That's correct.

Q: And you've now been in jail since early in May of 1980?

A: Yes, sir.

Q: I'll ask you, Mr. Waters, if during the course of your lifetime you have ever attempted to kill yourself?

A: Yes sir, on two occasions.

Q: All right, sir. Tell us about that.

A: The first time I attempted to take my life was a gunshot wound. The—I shot myself in the stomach with a .22 caliber rifle. On the second occasion, I taken some poisonous medicine which consisted of a bottle of rubbing alcohol and white linament.

Q: How long ago was the second occasion?

A: Something like 1966.

Q: How long ago was the first occasion?

A: I believe that happened in '64.

Q: Now, your marriage to the present Mrs. Waters, Helen Waters, is your second marriage, is it not?

A: Yes, sir.

Q: And your first marriage, did it end in divorce?

A: Yes, it did.

Q: Was there a child ...

A: Yes, sir.

Q: ... from your first marriage?

A: Yes, sir.

Q: And what age is that child now?

A: Sixteen.

Q: Where does she live?

A: In Lake City, Florida.

Q: Mr. Waters, you were formerly, were you not, a cab driver in Waycross?

A: Yes, sir.

Q: I'll ask you if you can tell us something about the events on and around the date of April the 25th, 1980, involving visits by you to Jekyll Island? For example, now, April the 25th, 1980, was on a Friday. Can you recall the Wednesday before that Friday going to Jekyll Island?

A: Yes, sir, I believe I went to Jekyll Island fishing that day.

Q: On that particular day, can you remember anything that happened?

A: Only I got read bad sunburned.

Q: And how did you get it, were you fishing or lying on the beach, or just ...

A: Both.

Q: ... how?

A: Both.

Q: And can you remember what happened after you left Jekyll that day?

A: The only thing that I remember, you know, that would be considered—I stopped by my sister's house and drank some tea.

Q: All right.

A: Which the sister I'm talking about in question is Georgia Rainey.

Q: All right. Now, then, about the next day, which would have been a Thursday, was there anything unusual about that day that caused you to remember that day?

A: Nothing unusual happened, no.

Q: Then on Friday, you remember, of course, that day, Friday?

testify. For example, during her cross-examination, she testified:

Q: Mrs. Waters, you say that your husband had a pistol there and he normally kept it on the dresser in the house?

A: At that particular time in that house he did, yes.

Q: At that particular time?

A: Yes, sir.

Q: Where did he keep it normally, every day?

A: There. I mean, during the past seven and a half years. When we were first married, he slept with a gun, not that gun, under a pillow, under his pillow.

Respondent's Exh. 1G at 1129–30.

A: Vaguely.

Q: Yes. Would you state to the Court what happened? Start out at the beginning of the day and state what happened on that Friday.

A: Mr. Davis, the best of my recollection is that the first thing that I remember as to happening on Friday was taking my wife to work.

Q: All right. And when you took her to work, what did you do?

A: I don't have any idea.

Q: Do you remember being on Jekyll that day?

A: Yes, sir.

Q: Can you tell us what time of day it was when you got to Jekyll that day?

A: Well, I can't be sure, but I would say sometime in the late morning.

Q: Now, you've, of course, sat through this trial, as you're entitled to do under the law. You heard a lady take the stand by the name of Mrs. Googe from Darien.

A: Yes, sir.

Q: Do you remember seeing her that day?

A: Yes, I believe I did talk to her on the beach that day.

Q: You heard what she had to say about the conversation that was had between you and her. Was that ...

A: Yes, sir.

Q: ... in accordance with the way you remember it?

A: Yes, sir.

Q: And then following that, can you tell us what happened next?

A: The only thing that—The next thing that comes to my mind, Mr. Davis, is that I was drinking, that I was drinking some alcohol, some whiskey. And in regard to the rest of the day, the only thing that I remember is just what is in the statement that I made to Mr. Curley.

Q: Well, now, we're going to have to go through that. But first I'll ask you a question or two. What were you drinking on that occasion?

A: Calvert's, I believe.

Q: And where had you gotten it?

A: I can't say for sure because I don't know.

Q: Well, what—All right. You don't know. Well, what size bottle was it in?

A: That particular one was a half-pint bottle.

Q: Did you wear it in your pocket when you weren't drinking out of it, that bottle?

A: No sir, I believe that it was in the car.

Q: In your car. Can you remember before the occasion where you encountered the two women who were killed, before that? Can you remember—Did you buy a chaser or go to a store or anything along that line at all?

A: Yes, sir, I believe that I bought some Gatorade, and some coffee, and also cigarettes, at the little Zippy Market, or whatever the name of it is, on Jekyll Island.

Q: Now, where is that Zippy Market located?

A: In the shopping plaza as you go into Jekyll, go onto the island.

Q: Do you know the area that people call the New Marina over there?

A: Yes, I do.

Q: Have you ever fished in it?

A: Many times.

Q: Did you go later after you'd been to this Zippy Mart, or Zippy Market, did you go over to the area of the New Marina?

A: Yes, sir.

Q: And when you got to that—What were you driving?

A: My '74 white Chevrolet.

Q: When you got over there, what did you see, if anything?

A: Nothing stands out in particularly. Now, there was a sailboat there in the river. This marina consists of a large lagoon that makes off from the river. There was a sailboat there and there were some people—I believe it was one black man and one black woman fishing.

Q: At the new marina?

A: Yes, sir.

Q: All right. Then after you observed that, what next happened?

A: The next thing that stands out to me that I have been able to recall, been able to recollect, was I went around to the far side of the New Marina, which it consists of a dirt, a narrow, dirt road, and there I saw this red car. Now, as to the make of the car, I have no idea.

Q: All right.

A: But there were two ladies coming up the—There is a steep incline there going down to the water. And I observed two ladies coming up that incline.

Q: Now, when you say coming up, would that have been from the water to their car, is that what you're ...

A: That's correct.

Q: ... telling us?

A: Yes, sir, that's what I'm trying to say.

Q: All right. And what occurred?

A: I pulled my car up beside of their's.

Q: So you were still driving when you saw them coming up?

A: Yes, sir, I was.

Q: All right.

A: And I got out of the car, my car, and pulled my gun on them.

Q: Now, you say you pulled your gun.

A: Yes, sir.

Q: Where had your gun been?

A: My gun was in my hip pocket, my right hip pocket.

Q: Was it there while you were driving?

A: Yes, it was.

Q: Did you have handcuffs?

A: Yes, sir, I think so.

Q: Where were they?

A: Probably in my pocket.

Q: Would that be the normal place for them to be?

A: No, sir, generally they were on the signal light reflector knob is where they generally were.

Q: Hanging, dangling?

A: Yes, sir.

Q: All right. You say—Now, you've already said that you pulled your gun on the ladies. Now, ...

A: Yes, sir.

Q: ... at that time, were you in your car or out of the car?

A: I was out of their car, out of my car and at the rear of their car.

Q: Where was your gun at that time?

A: In my hand.

Q: And where were the handcuffs at that time?

A: At that time, I guess the cuffs were in my pocket.

Q: All right. And what, if anything, was said when you got there and that happened? After that happened, what, if anything, was said?

A: I just—I told them that they were going to go with me. And I marched them across some, something like a hundred yards, to a wooded area where it's real brushy. And I guess my intentions was sex; I don't know. But anyway, Mrs. Culpepper, I believe her name was, put the cuffs on her wrist and Miss Paseur's wrist.

Q: Did you tell her to do that?

A: Yes, I believe I did.

Q: Were they fastened tight or loose?

A: No, sir, they were very loosely.

Q: Then what occurred?

A: I had—I made Mrs. Culpepper undress from the waist down, and I attempted to have oral sex with her.

Q: At that particular time, were they standing, sitting or lying down?

A: Lying down.

Q: Were they lying on their stomach or their back?

A: On their back.

Q: Were they side by side or in some other position?

A: Side by side, yes, sir.

Q: At any time during that time when you, as you stated you attempted to have oral sex, did you ever unzip your trousers?

A: No, sir, I did not.

Q: Did you ever take your trousers down?

A: No, sir.

Q: You did not undress at all?

A: No, sir.

Q: Now, when you say you attempted to have oral sex, it's necessary to, for this jury to understand exactly what you mean. Now, when you say that, do you, are you telling the jury that it was your mouth?

A: That's correct.

Q: Are you saying that it was her private, female part ...

A: That's correct.

Q: ... that was involved?

A: That's correct.

Q: And nothing else?

A: That's all.

Q: Now, how long did this attempt at oral sex last?

A: Not over three or four minutes.

Q: And during that time, what was Miss Paseur, the younger of the two ladies doing?

A: Well, she was laying side of Mrs. Culpepper, but she was very hysterical and she was screaming at Mrs. Culpepper.

Q: Screaming?

A: Yes, sir.

Q: All during that time?

A: Yes, sir.

Q: Do you remember the words she said?

A: The only thing that stands out is she accused Mrs. Culpepper of enjoying what I was doing to her.

Q: Is that a fact?

A: Yes, sir.

Q: Anyway, what next occurred?

A: Then after it was over with, they both got up and attempted to dress, Mrs. Culpepper did, as she had on, I believe it was a pair of shorts. I can't be sure, but I think that's what it was. And as she pulled her shorts up and got them buckled, or got them zipped, or however she fastened them, after she did this, her and Miss Paseur both at the same time made a lunge, and I don't know, I just—I had the gun on them and I pulled the trigger. And I believe that I struck Mrs. Culpep-

per, and then as she fell back, I shot Miss Paseur.

Q: Well, what length of time was there between the first shot and the second shot?

A: It was very close together.

Q: Did you fire two shots only?

A: Yes, sir.

Q: Not three?

A: No, sir.

Q: At the time that you fired the first shot, had Mrs. Culpepper gotten her clothes back on or not?

A: Yes, sir.

Q: And then what did you do?

A: I then left them both in the, on the ground and went back to my car.

Q: You did what?

A: I left them there and went back to my car.

Q: Did you do anything, one way or the other, with respect to the clothing of Miss Paseur?

A: Yes, I did, I ripped them.

Q: Did you do anything else?

A: No sir.

Q: Did you then go back to your car?

A: Yes, sir, I returned to my car and I passed by their car, or her car, which-ever one it belonged to, and I take her pocketbook off the front seat of the car.

Q: And then what did you do?

A: I immediately left the island.

Q: And where did you head?

A: Home.

Q: To Waycross?

A: Yes, sir.

Q: And what happened on the way to Waycross?

A: I threw the pocketbook out some-where around the Satilla River Bridge.

Q: Now, describe how you went at that. Did you throw it out over the passenger's seat, or on the same side you were, out of the window on your side?

A: I pulled over to the wrong side of the road from which I should have been traveling and tossed it out the window.

Q: The window you tossed it out of, was it the driver's side window?

A: That's correct, yes, sir.

Q: And did it go over the bannister of the bridge there?

A: Yes, sir, I think so.

Q: And then what did you do?

A: I proceeded on towards Nahunta, which just a few seconds, just a few minutes after this, I was stopped by a Brantley County Deputy Sheriff.

Q: You heard him testify. Was that the same man who stopped you?

A: Yes, sir, it was.

Q: Mr. Rowell?

A: Yes, sir.

Q: Meanwhile, had you looked in the pocketbook to see whether there was money in it or not?

A: Mr. Davis, I don't know whether I did or not.

Q: You do not know?

A: I do not know.

Q: Now, you've heard the testimony about what happened following that, and has that testimony been in accordance with your memory of the things that happened after that?

A: Yes, it has.

Q: And your memory doesn't tell you any different from what has been testified about, all of these things that happened following that?

A: No, sir, the best that I can remember, I would go in accordance with them.

Q: You what?

A: I would go in accordance with them.

Q: I didn't understand.

A: They would be in accordance.

Q: In accordance. All right.

Mr. Davis: You may examine the witness.[20]

After Waters' testimony, the defense rested. The jury found Waters guilty of both murders.

In the penalty phase of the trial, neither Davis nor the prosecutor offered any additional evidence. Davis did not request any particular charge on mitigating circum-

stances; rather, he acquiesced in the trial court's decision to give the following charge on mitigating circumstances:

Now, Members of the Jury, you should, you should consider all evidence submitted in the trial of this case in arriving at your verdict as to the sentences to be imposed. This would include any evidence of mitigating circumstances received by you in this case.

Even if you find beyond a reasonable doubt that the State has proved the existence of an aggravating circumstance or aggravating circumstances in this case which would justify the imposition of a death sentence, you are not required to recommend that the accused be put to death. You would be authorized under these circumstances to recommend the death penalty, but you are not required to do so.[21]

This is the only mention of mitigating circumstances in the trial court's entire charge to the jury.

Davis began his closing argument of the penalty phase by repeating this jury charge on mitigating circumstances. He did not, however, explain to the jury the meaning of "mitigating circumstances" or identify what evidence should be considered "mitigating." Davis did discuss Waters' mental problems, beginning with the statement. "It strikes me that Kelly Waters is a miserable wreck of a human being, a person in search of his identity as a person, a person in search perhaps of masculinity, but even greater than that, of identity itself as a person." [22] Davis did not, however, point out that Waters' mental problems should be considered a mitigating circumstance. Davis concluded his closing argument by asking the jury to make "a study" of Waters rather than killing him:

... Can any good come out of this case? I'll say it can. I'll say the good that can come out of it would be this. We know what happens to a case similar to Kelly Waters when he refrains from taking

**20.** Respondent's Exh. 1G at 1147–61.

**21.** Respondent's Exh. 1H at 1362.

**22.** *Id.* at 1344.

drugs. We've found out to our sorrow, to the utter shame of the County, to that event which brought so much sadness to the wife, to the families of the victims in this case, to that occasion which brought so much sadness to the family of the Defendant in this case. We found out what would happen. I say if he is allowed to serve a life, a sentence of life imprisonment, he is a living subject that can be studied, that upon whom the effects of drugs can be determine with more certainty than it can be now. He is a prime case of what can happen if he doesn't take drugs and what steps may be needed by society to ensure that a man in his boots needs to take drugs and needs to be put under such circumstances as you either know he's on drugs or else he's in a condition where, where nothing, no harm can come from him if he refrains from taking them. You going to make him responsible for taking them? Well, he's a nut to start with. It happens every day in our lives. You cannot depend on that. But in his case, you can. In his case, he's an ideal subject for the medical profession to say, all right, here is a man, called to God one day, called to. a pistol and handcuffs the next day. He's got that kind of split personality. He doesn't know whether to serve the Lord or serve the Devil. He doesn't even know whether he wants to be a person or not. We'll take him. We'll experiment with him. We'll find out more about what can, the limits of activity in his case. We'll use him for the good of society, so that an offense of this nature will not be repeated. That's the human thing to do in this case. It's a socially advisable thing to do. I agree this sort of thing excites the basest emotions I suppose that can be excited in the human breast; revenge, lack· of mercy, all of those kinds of emotions are excited in the· mind of any normal person that heard this evidence. Of course, it is. But what is the socially acceptable, merciful, biblical, Christian thing to do here? I say don't kill him. Don't rub him out. Don't put him out of existence. Keep him. Study him. Learn about him. Keep him so he can't do anybody else any harm. Maybe from the result of his continued life, the results ... of continued examination of him and a study of him will make it possible that the lives of more innocent people will not be sacrificed. I ask you to consider that. And I ask you in reaching your verdict to let this man continue to live in the interest of serving, doing your duty as an enlightened citizen facing up to the tremendous responsibility that the law vest upon you in this case.[23]

Finding three aggravating circumstances for each murder,[24] the jury imposed the death sentence.

On direct appeal, the Georgia Supreme Court affirmed Waters' convictions and sentences. The court, however, struck the aggravating circumstances of· aggravated sodomy for both murders as the sodomy was erroneously considered a capital offense. The court also struck the aggravating circumstance of the murder of Anita Paseur as it was a mutually supporting aggravating circumstance.[25] The United

---

**23.** *Id.* at 1353–55.

**24.** For the murder of Anita Paseur the jury found three aggravating circumstances; the murder was committed during the commission of three capital felonies: (1) kidnapping with bodily injury of Kathryn Culpepper; (2) the murder of Kathryn Culpepper; and (3) the aggravated sodomy of Kathryn Culpepper. For the murder of Kathryn Culpepper the jury found that the murder was committed during the commission of three other capital felonies: (1) kidnapping with bodily injury of Anita Paseur; (2) the murder of Anita Paseur; and (3) the aggravated sodomy of Kathryn Culpepper.

**25.** The imposition of the death penalty for the murder of Kathryn Culpepper was supported by the aggravating circumstance that her murder was committed during the murder of Anita Paseur. Likewise, the imposition of the death penalty for the murder of Anita Paseur was supported by the aggravating circumstance that her murder was committed during the murder of Kathryn Culpepper. Because these two aggravating circumstances were mutually supporting, the court arbitrarily struck the murder of Anita Paseur as an aggravating circumstance. *Waters,* 283 S.E.2d at 251.

States Supreme Court denied certiorari.[26]

Waters brought a petition for a writ of habeas corpus in state court. After an evidentiary hearing, the state trial court denied relief.[27] The Georgia Supreme Court denied a certificate of probable cause to appeal,[28] and the United States Supreme Court again denied certiorari.[29]

Waters then brought this petition in the United States District Court for the Southern District of Georgia. The district granted a stay of execution and a motion to proceed *in forma pauperis*. The court denied the state's motion to disqualify Waters' appointed counsel—a decision this court affirmed.[30] After denying Waters' request for an evidentiary hearing, the district court denied relief. This appeal followed.

## II. DISCUSSION

Waters urges this court to find that his trial counsel was constitutionally ineffective both in the guilt-innocence phase of his capital trial and in the penalty phase of the trial. We examine these two claims separately after briefly discussing the standard for resolving claims of ineffective assistance of counsel.

In *Strickland v. Washington*,[31] the Supreme Court set out a two-part test to be applied to claims that an attorney's representation of a criminal defendant was so deficient that the enforcement of the judgment constituted a violation of the sixth amendment. First, the Court noted that the defendant must show that counsel's conduct fell below "an objective standard of reasonableness."[32] When making this determination, the courts should recognize that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hind-

sight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[33] Second, the Court requires defendants to show that they suffered prejudice from the alleged failures of their attorneys. To prove prejudice, the defendant must show that "there is a reasonable probability that but for [counsel's errors,] the result of the proceeding would have been different." A reasonable probability is one that is "sufficient to undermine confidence in the outcome."[34] We now turn to the grounds Waters alleges constitute ineffective assistance.

### A. Ineffective Assistance At Trial

Waters alleges several errors relating to the performance of his attorneys during the guilt-innocence phase of trial. Waters argues that counsel had other viable defenses that they abandoned in order to pursue an insanity defense they could not prove. In addition, Waters argues that Davis and Manning should have argued that Waters was guilty of manslaughter only. Waters also argues that counsel could have attempted to place doubt in the minds of the jury concerning the confession and had the confession suppressed on fourth amendment grounds. Finally, Waters argues that had counsel competently challenged Waters' ability to waive his fifth and sixth amendment rights, the confessions would have been suppressed. After carefully examining the state trial record in light of these claims, we conclude that, while they are not without merit, they were nevertheless correctly dismissed by the district court. The quantity and quality of the evidence of guilt against Waters was so overwhelming that he cannot show prejudice from any of these errors. Because we find that Waters was not preju-

26. *Waters v. Georgia*, 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1398 (1983).

27. Respondent's Exh. 3E.

28. Respondent's Exh. 3H.

29. *Waters v. Kemp*, 475 U.S. 1039, 106 S.Ct. 1249, 89 L.Ed.2d 357 (1986).

30. *Waters v. Kemp*, 845 F.2d 260 (11th Cir.1988).

31. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

32. *Id.* at 688, 104 S.Ct. at 2064.

33. *Id.* at 689, 104 S.Ct. at 2065.

34. *Id.* at 694, 104 S.Ct. at 2068.

diced during the guilt-innocence phase of the trial by the errors he alleges that counsel committed, we decline to express an opinion on whether the performance of Davis and Manning as to the guilt-innocence phase actually did fall below an objective standard of reasonableness.[35]

We begin by discussing the evidence of guilt that is unchallenged by the petitioner. There were several witnesses that placed Waters on the island at the time of the murders. Waters himself had told the officers investigating the crime that he thought he had been on the island fishing on the day of the murders.[36] Before dying, Mrs. Culpepper gave agent Curley a description of the murderer and the car he was driving; these descriptions matched both Waters and his car. Finally, later that afternoon, Deputy Sheriff Rowell encountered Waters on the road that would be used by someone traveling from Jekyll Island to Waters' home. The physical evidence obtained by the police also connects Waters to the crime. When the investigating agents returned with Waters to his house, Waters provided them with the clothes he was wearing on the day of the murders. These clothes matched the descriptions provided by Rowell, Culpepper, and Googe. The .38 caliber bullet removed from Mrs. Culpepper was characterized at trial as probably the same brand as the ammunition Mrs. Waters removed from her husband's .38 caliber revolver. The state's crime lab expert found that the bullet removed from Mrs. Culpepper produced similar markings as bullets that were later fired from Waters' revolver.[37] Mrs. Waters provided the police with a holster matching Mrs. Culpepper's description of the holster carried by the murderer. In addition, Deputy Rowell had observed Waters driving slowly over the Satilla River bridge on the day of the murder. Several days after the murder, the purse taken from Mrs. Culpepper by the murderer was found on the bank of that river just below the bridge.

Waters had no alibi for the date and time of the crime. While he was a part-time taxi driver in Waycross, Georgia, he did not go to work on the day of the murders. The record does not reflect that there were any witnesses who could place Waters anywhere but on Jekyll Island on the day of the murder.

Finally, although Waters' confession to the police provided the most damaging evidence against him, his statements prior to the confession were also damaging. Waters told his sister "I think I may have killed some people." In addition, Waters, a former jailer, admitted to owning a pair of handcuffs.

■ Waters argues that counsel had other viable defenses that they abandoned in order to pursue an insanity defense they could not prove. First, Waters argues that he had a viable defense of misidentification. Waters bases this argument on the testimony of three people that were near the murder scene who could not identify Waters. The district court rejected this argument because "none of the witnesses who did not identify the petitioner could have exonerated him, and the overwhelming evidence that petitioner was present on Jekyll Island at the time of the crime could not have been controverted by testimony of individuals near the scene who did not iden-

**35.** *See id.* at 697, 104 S.Ct. at 2069 (when a court determines that the defendant was not prejudiced by his attorney's actions, no further analysis needed).

**36.** This evidence was provided to the authorities in an interview conducted at the local state patrol station after Waters had agreed to accompany the officers to the station. He was not in custody at this time and had been read his rights prior to the questioning by the officials. While the petitioner argues that Davis was ineffective for failing to challenge Waters confes-

sion, he has not argued that the admissibility of the statements Waters made before he confessed to the murders was subject to any viable challenge. Nor do we find that any viable challenge existed with respect to these pre-arrest statements.

**37.** Although microscopic examination revealed differences between the test bullet and the bullet recovered from the victim, an examination of the revolver revealed that the barrel of the revolver had been nicked and gouged, possibly by an object like a screwdriver.

tify petitioner." [38] Based upon our review of the record, we are in agreement with this conclusion.

◼ Second, Waters argues that counsel could have argued that Waters was at most guilty of manslaughter. Even if the jury believed Waters' testimony concerning the victims flinching towards him, there was no evidence to indicate that Waters fired the shots after "serious provocation sufficient to excite" violent passion as is required by Georgia law.[39]

◼ Third, Waters argues that counsel could have attempted to place doubt in the minds of the jury concerning the confession. In light of the evidence presented concerning Waters' state of mind at the time of the confession, and in light of the other evidence placing Waters at the scene of the shooting, we conclude that it is extremely doubtful that the jury would have accepted such a strategy. Waters also argues that the confession could have been challenged on various fourth, fifth, and sixth amendment theories. Our review of the record indicates that Davis did attempt to challenge whether the confession was voluntary. Moreover, even assuming that there existed a successful challenge to the confession, we agree with the district court's holding that Waters has not shown that the exclusion of the confession would have changed the verdict.

In short, Waters has failed to show that there is a reasonable probability that the guilty verdict returned by the jury would have been different absent the alleged errors of counsel. We find that there exists overwhelming evidence of Waters' guilt—even excluding the evidence Waters challenges. Accordingly, we reject the claim of ineffective assistance of counsel as it ap-

plies to the guilt-innocence phase of the trial.

**B. Ineffective Assistance At Sentencing**

◼ While we reject Waters' claim that his attorneys were constitutionally ineffective in the guilt-innocence phase of his trial, that conclusion does not end our inquiry. Defendants on trial in capital cases have the right to effective assistance of counsel in sentencing proceedings used to determine whether the death sentence will be imposed.[40]

◼ Review of the entire trial transcript and of Attorney Davis' testimony at the state habeas proceeding leaves absolutely no doubt that the defense presented by Davis at the sentencing phase of Waters' trial was ineffectual. Davis tried the case just as a criminal defense lawyer would have prior to *Furman v. Georgia* [41] and its sequelae.[42] Prior to *Furman*, a defense attorney would plead the defense of insanity, put in the psychiatric evidence, and seek the jury's sympathy. After only one set of closing arguments, the jury was instructed, and the jury returned a verdict including both the decision of whether the defendant was guilty, and if so, whether the penalty was death or a life sentence. *Furman* changed all of this. In *Furman*, the Supreme Court struck down virtually every death penalty sentence in the country because they were imposed under statutes that led to arbitrary and unguided impositions of the death sentence. These pre-*Furman* statutes provided no means for differentiating between who received a death sentence and who did not. The *Furman* decision prompted over thirty states to enact new capital statutes that attempted to respond to the concerns about arbitrariness. In 1976, the Court validated certain of these new statutes in *Gregg v.*

---

**38.** R2–32 at 18.

**39.** *See Swett v. State,* 242 Ga. 228, 248 S.E.2d 629, 631 (1978).

**40.** *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

**41.** *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

**42.** It is noteworthy that Davis admitted at the state habeas proceeding that, prior to Waters' trial, he had last been involved in a capital case sometime prior to 1961, more than 10 years before *Furman* was decided. Respondent's Exh. 3B at 67.

*Georgia*[43] and companion cases. The Court held that a death sentence may not be imposed unless the sentencing authority finds the presence of at least one statutory aggravating factor and then weighs that factor against the evidence of mitigating factors adduced by the defendant. In general, a system for imposing the death penalty must focus on the circumstances of the crime and the character of the individual defendant, and must provide "specific and detailed guidance" as to whether to impose the death penalty.

Two year after *Gregg*, in *Lockett v. Ohio*,[44] the Court held that in order to be constitutional a capital sentencing procedure must permit consideration as a mitigating circumstance "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." [45] As recently as 1990, the Supreme Court again admonished that "[t]he Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner." [46]

█ It is well established that a mental illness such as that under which Waters suffers is such a mitigating circumstance.[47] Attorney Davis at no point in the trial—opening statement, argument at the end of the penalty phase, or argument at the end of the sentencing phase—informed the jury of the role of aggravating and mitigating circumstances. As is discussed below, this lack of education of the jury by Davis coupled with the sparse reference by the trial court to "mitigating circumstances" in its instructions to the jury resulted in a

nullification of the lessons of *Furman, Lockett,* and their progeny and rendered the sentencing phase of Waters' trial constitutionally defective.

Our circuit has considered similar instances of ineffective assistance at the sentencing phase of a death penalty case. For example, in *Blanco v. Singletary*,[48] we held that counsel's performance was constitutionally deficient where he failed to pursue mental health mitigating evidence, including evidence of an impoverished childhood, epileptic seizures, and organic brain damage. Similarly, in *Middleton v. Dugger*,[49] we affirmed the district court's grant of the writ as to sentencing phase based on counsel's failure to present mitigating mental health evidence. And in *Cunningham v. Zant*,[50] we said:

> [W]e find that, in light of the ready availability of the evidence and the absence of a tactical justification for its exclusion, the failure by trial counsel to present and argue during the penalty phase any evidence regarding Cunningham's mental retardation, combined with his failure to present and argue readily available additional evidence regarding Cunningham's head injury, his socio-economic background, or his reputation as a good father and worker, fell outside the range of professionally competent assistance.[51]

Likewise, Davis' failure to present and explain readily available mitigating evidence fell outside the range of professionally competent assistance.

Davis knew that the insanity defense would not be successful; his strategy, at least as he articulated it at the state habeas

---

**43.** *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**44.** *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

**45.** *Id.* at 604, 98 S.Ct. at 2965.

**46.** *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990).

**47.** *See* cases cited in notes 48–51.

**48.** *Blanco v. Singletary,* 943 F.2d 1477, 1503 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992).

**49.** *Middleton v. Dugger,* 849 F.2d 491, 495 (11th Cir.1988).

**50.** *Cunningham v. Zant,* 928 F,2d 1006 (11th Cir.1991).

**51.** *Id.* at 1018. *See also Armstrong v. Dugger,* 833 F.2d 1430, 1432–34 (11th Cir.1987) (counsel's performance constitutionally deficient where he failed to present mitigating evidence, including evidence that petitioner was mentally retarded and had organic brain damage).

proceeding, was to make a case for mercy during the guilt-innocence phase of the trial. Federal courts generally will not second-guess a trial counsel's strategic decision, so long as the decision is reasonable.[52] Davis' strategic decision to make a case for mercy during the guilt-innocence phase may have been reasonable had Davis followed through with this strategy; he did not. Our review of the trial transcript indicates that Davis so totally and completely failed to execute his strategy that we must find his performance constitutionally deficient.

■ We find that Davis committed at least five constitutionally significant errors. First, he failed to elicit from the defendant's medical experts available mitigating evidence regarding Waters' mental condition. As noted above, this court has repeatedly recognized that counsel's failure to introduce evidence of mental illness at the sentencing stage renders his or her performance constitutionally deficient.[53] In this case, Davis did manage to introduce some evidence of Waters' mental illness during the guilt-innocence phase, but it was all focused upon proving the insanity defense. Notwithstanding his stated strategy of presenting a case for mercy during the guilt-innocence phase, Davis appears not to have focused *at all* on establishing mitigating circumstances. Indeed, the evidence presented at Waters' state habeas proceeding established that the medical experts had *no idea* that Davis intended that they testify as to mitigating circumstances during the guilt-innocence phase. This makes apparent that Davis had no idea about the existence of *Furman, Lockett,* and their progeny; he had no idea of the necessity of introducing mitigating evidence and arguing the balancing of aggravating and mitigating circumstances at the sentencing hearing. For example, he did not elicit from the psychologist her opinion that Waters' mental illness "would have affected his conduct" on the day of the killings or her opinion that it would have been consistent with Waters' condition "for him to have been hallucinating" that day.[54] This evidence would have at least offered the jury an alternative to Dr. Bosch's devastating conclusion (elicited by Davis on redirect examination) that there was no connection between Waters' mental illness and the killings and to Dr. DeLatorre's devastating conclusion (also elicited by Davis on direct examination) that Waters was in good contact with reality. In addition, although Davis elicited much unfavorable testimony from Dr. Bosch, he failed to elicit available favorable testimony, specifically, Dr. Bosch's opinion that Waters has a "serious mental disorder" that should be considered a "strong mitigating factor" and his opinion that Waters does not appear to have a "criminal type personality." There is no explainable reason for failing to present this favorable evidence.

■ Second, Davis failed to elicit a wealth of available mitigating evidence from Waters' sisters. The sisters' testimony regarding Waters' troubled childhood, his history of mental illness, and his lack of violent behavior may have convinced the jury that Waters is a man worthy of life instead of death. Indeed, by putting the sisters on the stand and failing to elicit such testimony, Davis undoubtedly misled the jury into believing that the sisters had nothing favorable to say about their brother.[55]

■ Third, Davis presented evidence that was not only very harmful but was devastating to his client's plea for life. Davis called to the stand witnesses who

52. *Stanley v. Zant,* 697 F.2d 955, 966 (11th Cir. 1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).

53. *See* cases cited in notes 48–51.

54. Respondent's Exh. 3B at 115–16.

55. *See Stephens v. Kemp,* 846 F.2d 642, 653–54 (11th Cir.) ("The only testimony the jury heard at sentencing concerning appellant's mental history and condition, including bizarre behavior he occasionally exhibited, was that which was presented by his mother. As her testimony makes clear, many others could have testified concerning his behavior; the fact that others did not do so undoubtedly diminished the impact on the jury of the facts she described. [Footnotes omitted.]"), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

*never* should have been a part of the defense case. For example, Dr. DeLatorre's *entire testimony* was harmful to Waters. In *Magill v. Dugger,*[56] this court addressed a similar situation; in reaching its decision to vacate the petitioner's death sentence, the court noted:

> Dr. Barnard, a court appointed psychiatrist, dealt the defense a devastating blow when he testified on cross-examination that Magill was not under the influence of an extreme emotional or mental disturbance at the time of the crime. This testimony, from a *defense* witness, virtually precluded the jury from finding that Magill had established one of the statutory mitigating factors.[57]

Like Dr. Barnard in Magill's case, Dr. De-Latorre dealt Waters a "devastating blow" when he testified that Waters' condition was anxiety neurosis, not paranoid schizophrenia, and that Waters was "in good contact with reality." Davis' performance with respect to Dr. DeLatorre's testimony is even more egregious than that of Magill's counsel because Dr. DeLatorre's harmful testimony was elicited by *Davis* on *direct examination*, rather than by the prosecutor on cross-examination. Davis' decision to call Dr. DeLatorre as a witness for the defense cannot possibly be considered reasonable. Due to obvious lack of preparation, Davis called Dr. DeLatorre to the stand having no idea what he would say.

Davis' decision to put Waters on the stand also cannot be considered reasonable. Waters description of the killings, elicited by Davis' questioning, is chilling. In response to Davis' very pointed and specific questions, Waters described the reaction of the younger of his two victims to his attack: "she was very hysterical and she was screaming...." Even Davis admitted at the state habeas proceeding that this description was "highly adverse" to Waters.[58] Other than his description of the killings, Waters' testimony did not give the jury *any* information that was not already in the record.[59] There simply was no justifiable reason for putting Waters on the stand. We find instructive here a statement quoted by the court in *Magill:*

> "If [counsel] did know that his client was going to say that [he was guilty of premeditated murder], then he was ineffective for presenting this testimony and convicting him out of his own mouth.... If he did not know, he was ineffective for not knowing."[60]

We need not speculate as to whether Davis knew what his client's testimony would be; either way, his performance was clearly deficient.

Even as to witnesses that offered some favorable testimony for Waters, Davis elicited harmful evidence that would not have come out but for his persistent questioning. Indeed, Davis' questioning often looks at worst like that of an assistant to the prosecutor and at best like that of a neutral factfinder. For example, *after* the prosecutor had completed his cross-examination of Dr. Bosch, Davis proceeded with a redirect examination that elicited *nothing* but information harmful to Waters. Dr. Bosch even resisted Davis' attempts to elicit unfavorable information, but to no avail. With a persistence that resembled that of a prosecutor, Davis elicited Dr. Bosch's opinions that Waters attacked his victims to fulfill his sexual desire and that there was no relationship between Waters' mental illness and the killings.

**56.** *Magill v. Dugger,* 824 F.2d 879 (11th Cir. 1987).

**57.** *Id.* at 889.

**58.** Respondent's Exh. 3B at 60.

**59.** Dr. Bosch had already testified as to Waters' suicide attempts. Respondent's Exh. 1F at 1000–01. In his redirect examination of Waters, Davis, apparently as an afterthought, asked Waters if he had stopped taking his medication sometime before the killings. Although obviously unprepared for the question, Waters did testify that he had stopped taking the medication "[a] few days[,] I don't know just how many" before the killings. Respondent's Exh. 1G at 1181. The psychologist had already testified that Waters had stopped taking the medication a few weeks before the killings. Respondent's Exh. 1F at 939.

**60.** *Magill,* 824 F.2d at 887 (quoting an expert in the field of capital defense).

Fourth, Davis totally failed to make appropriate use of what little mitigating evidence he did present; specifically, he failed to ensure that the jury received guidance concerning how Waters' mental illness could constitute a mitigating factor. A capital sentencing proceeding is constitutionally deficient if a "reasonable juror could have failed to understand the meaning and function of mitigating circumstances."[61] In *Stephens v. Kemp*, this court vacated the defendant's death sentence based in part upon the lack of guidance regarding mitigating evidence:

> [A]lthough the jury heard some testimony concerning [the defendant's] mental condition, the jurors were left with no guidance concerning how they might take such facts into consideration in mitigation of punishment.[62]

Like the jury in *Stephens*, the jury in this case received absolutely no guidance from either the trial court or Davis concerning how they might take Waters' mental illness into consideration in mitigation of punishment. The trial court's charge to the jury, to which Davis did not object, was marginal at best. In *Cunningham v. Zant*, this court recently held:

> Where a defendant has specifically presented mitigating evidence, the absence of any explanatory instructions on mitigation creates a reasonable possibility that the jury misunderstood the meaning and function of the mitigating evidence in the sentencing deliberations.[63]

The trial court's charge in this case mentions mitigating circumstances only once, only very briefly, and, like the charge condemned in *Cunningham*, without any explanation whatsoever. Moreover, the charge fails to give the jury any indication that mental illness may be considered a mitigating circumstance. The Supreme Court recently held:

> [I]n the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of [the defendant's] mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision.[64]

Given the absence of any mention of mental illness during the trial court's charge at the sentencing phase, it is probable that the jury concluded that any evidence of Waters' mental illness was relevant only to the insanity defense and not to the sentencing.

While the adequacy of the trial court's instruction on mitigating circumstances concerns us, we need not and do not decide whether the instruction is so deficient as to render Waters' death sentence constitutionally invalid.[65] Rather, we decide that Davis' deficient performance combined with the trial court's deficient instructions

---

**61.** *Peek v. Kemp*, 784 F.2d 1479, 1489 (11th Cir.) (*en banc*), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).

**62.** *Stephens v. Kemp*, 846 F.2d at 655.

**63.** *Cunningham v. Zant*, 928 F.2d at 1012 (footnote omitted).

**64.** *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 2952, 106 L.Ed.2d 256 (1989).

**65.** This court has on two occasions upheld death sentences when the instructions on mitigating circumstances were very similar to the instructions in this case; however, both of those cases are distinguishable from this case. In *Williams v. Kemp*, 846 F.2d 1276, 1285 (11th Cir.1988), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990), the court noted that, "although the trial court's instructions themselves did not focus on particular mitigating circumstances, the fact that the prosecution presented no additional evidence during the sentencing hearing while the four defense witnesses testified on Williams' behalf 'cast[s] an explanatory light' on the nature and function of mitigating circumstances." In Waters' case, no evidence was presented during the sentencing hearing to cast an "explanatory light." And in *High v. Kemp*, 819 F.2d 988 (11th Cir.1987), *cert. denied*, 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989), this court excused the instruction because the defendant had presented no evidence at either the guilt or sentencing phase of trial: "We refuse to admonish the trial judge for wisely deciding not to belabor instructions on mitigation where the effect would have been to emphasize that there was no mitigating evidence on the defendant's behalf." *Id.* at 992. Waters' mental illness constituted mitigating evidence.

undermine our confidence in Waters' sentencing proceeding.[66] Davis did not explain in his closing argument that mental illness could be considered a mitigating factor; indeed, he failed to give the jury any guidance as to how they might take the evidence of mental illness into consideration in mitigation of punishment. In *Lockett v. Ohio,* the Supreme Court said:

> There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.[67]

The combined failure of the trial court and Davis to give the jury any guidance as to mitigating circumstances prevented the jury from "giving independent mitigating weight" to aspects of Waters' character. We conclude that a reasonable juror could have "failed to understand the meaning and function of mitigating circumstances." [68]

Finally, Davis compounded all of these errors by concluding the sentencing hearing not with a plea for mercy for a human being, but with a request to allow a specimen to be studied: "We'll experiment with him.... Don't rub him out. Don't put him out of existence. Keep him. Study him." This approach would have been questionable had Davis been asking to spare the life of a mad dog; employed in asking to spare the life of a man, the approach borders on barbarity. Davis essentially gave the jury two choices: (1) keep Waters alive so that those interested in mental illnesses could conduct experiments upon him and study him, or (2) put Waters to death. Certainly, a reasonable juror could have concluded that the latter alternative was the more merciful.

Having concluded that Davis performance was constitutionally deficient as to the sentencing phase of Waters' trial, we have little difficulty finding that Waters was prejudiced. Davis failed to present a wealth of available favorable testimony, and the state has not shown that the presentation of this evidence would have resulted in the presentation of any unfavorable evidence. Moreover, there can be no doubt that the unfavorable testimony elicited by Davis and the portrayal of Waters by Davis in his closing argument made the jury more likely to impose the death sentence. In addition, we think that it is likely that counsel's errors obscured the little favorable evidence of Waters' background that was presented.

Each of the attorney errors noted above made it more likely that Waters would receive the death sentence. When we review these errors together, they undermine our confidence in the outcome of the penalty proceeding and cause us to conclude that the sentencing phase of Waters' trial was constitutionally deficient and did not meet the requirements of *Furman, Lockett,* and their progeny.

## III. CONCLUSION

As Waters has met both of the *Strickland* requirements as to the penalty phase of his trial, we find that he was denied effective assistance of counsel in that proceeding. The decision of the district court to deny the writ as to Waters' convictions is AFFIRMED; however, the decision of the district court to deny the writ as to Waters' sentence of death is REVERSED, and this case REMANDED to the district court with instructions to grant the writ unless the state provides Waters with a constitutionally adequate sentencing pro-

---

**66.** *Magill,* 824 F.2d at 890.

**67.** 438 U.S. at 605, 98 S.Ct. at 2965. *See also Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982) ("neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence").

**68.** *Peek,* 784 F.2d at 1489.

ceeding within a reasonable time period to be specified by the district court.[69]

**TJOFLAT**, Chief Judge, concurring in part and dissenting in part:

I respectfully but vigorously dissent from the majority's conclusion that Eurus Kelly Waters received ineffective assistance of counsel with respect to his sentencing.[1] The majority opinion illustrates the pitfalls of hunting through a trial transcript for alleged transgressions while making no attempt to discern the overall trial strategy adopted by defense counsel. In short, the majority today is too lost in the trees to see the forest.

Attorney Davis confronted overwhelming evidence that his client had in fact shot and killed the two women with whose murder he was charged. In Davis' own words, the only mystery to be solved was Waters' mental state. Faced with the impossibility of successfully rebutting the state's factual case, Davis saw in Waters' long history of mental illness the seeds of a more promising defense. Under Georgia law, a criminal defendant may be found "not guilty by reason of insanity" if he proves by a preponderance of the evidence that, at the time of the alleged offense, he did not know the difference between right and wrong.[2] *See* O.C.G.A. §§ 16–3–2 (1982); *Keener v. State*, 254 Ga. 699, 334 S.E.2d 175, 177–78 (1985). Davis determined that he would emphasize Waters' unstable mental condition and construct an insanity defense. This strategy had more than one

potential benefit. If it succeeded, as Davis hoped, the result would be an outright "not guilty by reason of insanity" verdict. If insanity could not be proven, the extensive evidence of Waters' mental illness might still be argued in the sentencing phase in an effort to avoid the death penalty.

To prepare his defense, Davis researched Waters' mental condition. He interviewed a local doctor (Dr. Wiley Lewis) who had treated Waters for mental disorders, a psychiatrist (Dr. Lorenzo Lecumberri) who had treated Waters at a local mental health clinic, a psychiatric nurse (Saradell Cureton) from the clinic, a forensic psychiatrist (Dr. Miguel Bosch) who had several sessions with Waters following his arrest, and a psychologist (Jerry Bowman) who had assisted at those sessions. Later, after Waters had been sent to Central State Hospital for still further examination, Davis spoke with the medical director of the hospital's forensic services division (Dr. Hosea De La Torre), who had had three or four interviews with Waters. In addition to these experts, Davis interviewed Waters' wife and other members of his family.

Davis' investigation revealed that Waters suffered from paranoid and schizophrenic tendencies, delusions and hallucinations, and sudden mood swings ranging from calmness and apparent happiness to depression and aggressive, hostile behavior. Davis learned that persons with paranoid schizophrenic tendencies can be successfully treated with anti-psychotic drugs; when a patient is taking the medication, the psy-

---

**69.** Our resolution of the issue of ineffective assistance of counsel renders a decision concerning the remainder of the claims Waters raises regarding the sentencing phase of his trial unnecessary. We therefore express no view of the correctness of the portions of the district court's opinion relating to these issues. We have examined the claims regarding the admission of the confession, the adequacy of the waivers, the change of venue, and the jury charges in the guilt phase and find these objections meritless. Finally, we find that the district court's refusal to hold an evidentiary hearing on several of Waters' claims was not an abuse of discretion.

**1.** With respect to petitioner's remaining claims for relief, I concur in the court's disposition, affirming the district court's denial of relief.

**2.** The majority criticizes Davis for adopting an insanity defense even though none of his expert witnesses could testify that, in their opinion, Waters did not know the difference between right and wrong at the time of the crime. Under Georgia law, however, the jury makes the sanity determination for itself with or without the aid of expert testimony. *See Moses v. State*, 245 Ga. 180, 263 S.E.2d 916, 918 (1980); *Briard v. State*, 188 Ga.App. 490, 373 S.E.2d 239, 241 (1988). Given the extensive testimony from both expert and lay witnesses concerning Waters' mental condition and from Waters himself concerning the circumstances of the shootings, *see infra*, there was ample evidence to serve as the predicate for a jury finding of at least temporary insanity.

chotic symptoms disappear and the person seems perfectly normal, but if medication is discontinued, the old symptoms re-emerge. He discovered that Waters had previously been committed to a mental institution, but that, after his release, doctors were attempting to control Waters' symptoms through drug therapy on an outpatient basis. Finally, Davis learned that Waters had not been taking his medication for some weeks prior to the murders.

This information became the foundation for the defense's theory at trial. In his opening statement, Davis laid the groundwork, explaining to the jury that his client's "not guilty" plea was not based on Waters' not having committed the acts in question but, rather, on his mental condition at the time. After the prosecution rested, Davis called his witnesses.

First, Dr. Wiley Lewis, the general practitioner who had treated Waters for mental problems, took the stand. Davis elicited testimony from the doctor that Waters was suffering from mental illness in 1976, with schizophrenia "a distinct possibility." Trial Transcript at 872. Dr. Lewis stated that he had prescribed Thorazine, an anti-psychotic drug, for Waters' "agitation, anxiety, and restlessness." *Id.*

Saradell Cureton, the psychiatric nurse at the Waycross Mental Health Clinic, testified that she first met Waters in 1978, when he voluntarily came to the clinic to seek help. Ms. Cureton remembered that Waters was depressed, suffered from "feelings of violence," *id.* at 911, and "was filled with a great deal of fear about himself," *id.* at 882. She reported that Waters "was getting messages from God that were disturbing him [and he] had a great deal of fear about his own actions and reactions." *Id.* at 882. Ms. Cureton was sufficiently concerned about Waters to refer him to a psychiatrist, Dr. Lorenzo Lecumberri, for evaluation.

Dr. Lecumberri testified that his interviews with Waters in 1978 and 1979 had led him to diagnose "schizophrenia, paranoid type." *Id.* at 951-52. In response to Davis' questions, he defined schizophrenia as "a mental disease ... that affects [a

person's] thought and his behavior," and paranoia as "delusional persecution." *Id.* at 952. To help Waters, the doctor prescribed Mellaril, also an anti-psychotic drug but stronger than Thorazine. He explained that Mellaril "improve[s] the thinking and the thought of the patient[,] ... decreases the activity of the patient, and controls the anger or hostility the patient has." *Id.* at 954. When Dr. Lecumberri last saw Waters, in the fall of 1979, Waters had been on Mellaril for approximately one year. The doctor described him as being "in good contact" and "not psychotic" on that occasion. *Id.* at 953. He emphasized to Waters the importance of continuing to take the medication. *Id.* at 955.

Dr. Miguel Bosch, the forensic psychiatrist from the Georgia Regional Hospital in Savannah who examined Waters after his arrest, concurred in the diagnosis of paranoid-type schizophrenia. He testified that Waters was pleasant and cooperative during their first session, pointing out that Waters was once again on Mellaril. When Waters returned from Central State Hospital, however, Dr. Bosch noticed that he was uncomfortable, tense, depressed, angry, and not sleeping as well; his medication had been changed to a less powerful drug. Davis asked Dr. Bosch what would happen if, sometime prior to committing the acts in this case, Waters had been taking an anti-psychotic drug and then stopped altogether. The doctor suggested several possibilities. First, Waters might become a little more uncomfortable, shakier, more nervous, more depressed, and have more difficulty sleeping and getting along with people. Second, his condition might become worse—he might become very withdrawn and unable to function, or he might hallucinate and start to feel persecuted. Finally, in the worst event, he might become acutely psychotic. Jerry Bowman, the psychologist who interviewed Waters along with Dr. Bosch, testified that Waters had not been taking his medicine at the time of the murders.

The final expert witness was the medical director of the forensic services division of Central State Hospital, Dr. Hosea De La

Torre, a psychiatrist. Although he disagreed with the specific diagnosis of paranoid-type schizophrenia, Dr. De La Torre confirmed that Waters was mentally ill and that persons with his particular mental problems react differently than normal people do. In the doctor's words, people with Waters' mental disorders "exaggerate [their] actions [and] become violent at times." *Id.* at 1015–16.[3]

In addition to these experts, Davis called friends and family members. Jimmie Lee Sapp, a fellow churchgoer who received his license to preach at the same time that Waters received his, testified that he knew Waters as a good, quiet, religious man. Waters' wife testified that she had seen him in times of great anxiety when he would become hyperactive and talk uncontrollably for up to five hours. She told the jury that his behavior was often confusing; on the night he realized that he might have killed the two women, she was so afraid he might harm himself that she hid his gun. Waters' sisters and brother-in-law testified about his initial horror at the thought that he might have killed the two women and about his extreme remorse and despair when he realized that he most probably had.

Then Waters himself took the stand. Later, at the evidentiary hearing in state court on Waters' claim that Davis' performance was substandard, Davis would explain that he called Waters to "allow the jury to form a clear idea of what Kelly Waters was like as a person." The majority contends that "[t]here simply was no justifiable reason for putting Waters on the stand." *Ante*, at 1495. Davis' strategy, however, is clear. By the time Waters testified, the jury had heard ample testimony suggesting that Waters was, in effect, *two different persons:* the paranoid-schizophrenic, out of touch with reality and capable of losing control when not medicated, and, in contrast, the medicated, unemotional, normal-appearing witness the jury observed in the courtroom. Waters was not called for the purpose of reciting personal details; he was called to "solve the mystery" of which personality was ascendant during the tragic events on Jekyll Island.

Davis first established that Waters' intent in accosting and handcuffing the two women was to have sex, not to kill. He then had Waters testify that he made the women lie down on their backs still handcuffed to one another, made Mrs. Culpepper undress from the waist down, and performed oral sex on her without attempting to do more. At this point, Davis began the exchange that so baffles the majority:

Q. And during that time, what was Miss Paseur, the younger of the two ladies, doing?

A. Well, she was laying side of Mrs. Culpepper, but she was very hysterical and she was *screaming at Mrs. Culpepper.*

Q. Screaming?

A. Yes, sir.

Q. *All during that time?*

A. Yes, sir.

Q. Do you remember the words she said?

---

**3.** The majority criticizes Davis for not introducing all the available mitigating evidence concerning Waters' mental condition. *See ante* at 1494. I am at a loss to know what more the majority would have had Davis do. Much of the material referred to in the affidavits presented to the state habeas court simply duplicated the evidence introduced at trial.

Dr. Bosch, for example, testified *at length* about Waters' paranoid-schizophrenic condition: his feelings of persecution, anxiety, loss of control, anger, depression, and his great need for continuous drug therapy in strong doses. *See* Trial Transcript at 976–85 (direct), 998–1003 (redirect). Surely the majority cannot be seriously concerned about the doctor's not characterizing Waters' disorders in so many words as "mitigating factors," although its opinion is susceptible of that inference. *See ante* at 1494 ("[A]lthough Davis elicited much unfavorable testimony from Dr. Bosch, he *failed to elicit* available favorable testimony, specifically, Dr. Bosch's opinion that Waters has a *'serious mental disorder'* that should be considered a *'strong mitigating factor'* and his opinion that Waters does not appear to have a 'criminal type personality.'" (emphasis added)). I cannot believe that, even if Davis had tried to do so, the prosecutor and the trial judge would have allowed Davis to elicit from Dr. Bosch or any other witness what would amount to a jury instruction on mitigation.

A. The only thing that stands out is she accused Mrs. Culpepper of enjoying what I was doing to her.

Q. Is that a fact?

A. Yes, sir.

Trial Transcript at 1157–58 (emphasis added.)

Immediately after this exchange, Davis established that Waters allowed the women to get up and dress. It was then that, according to Waters, the two women "lunged" at him. Up to that point, Waters had *perceived no threat* from the women. In his version of events, while he was assaulting Mrs. Culpepper, Miss Paseur was not struggling with him; she was just screaming. She was not even screaming at Waters; she was screaming at Mrs. Culpepper. Then, with the two women on their feet lunging toward him, the man whose psychotic tendencies, delusions of persecution, and lack of control had been repeatedly emphasized throughout the defense's case—the man who had not been taking critically necessary medication—*perceived a threat* from his victims and fired his gun at them. Davis' line of questioning may not have been the one the majority today would have adopted, but it is certainly well within the permissible range of strategic choices that the Supreme Court cautions us not to second-guess. *See Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984).

In his argument at the sentencing phase, Davis built upon all the psychiatric evidence adduced during the guilt phase. He began by depicting Waters as a man in search of his identity, a man who had twice attempted to commit suicide, a man torn between good and evil. He reminded the jury that the same man who was called by God to preach sermons at his church at other times went around with handcuffs and a gun. Davis continued:

Here you have a man, goodness only knows what kind of a storm was taking place in his mind and in his brain.…. You don't know. Maybe he didn't know. His wife certainly didn't know. But we know this much from the evidence in the case, whatever it was, whatever torment he was suffering, whoever it was winning, either the Lord or the Devil, for control of his behavior, we know that that behavior impelled him to go to the Mental Health Clinic in Waycross, Georgia, and talk to Miss Saradell Cureton and be interviewed there.… [H]e said, "I am afraid; I am afraid I am going to kill somebody." You'll have that [evidence] out with you [when you deliberate]. At that time, he didn't know whether the forces of evil were going to take control of him; or the forces of good.

Trial Transcript at 1345–46. Davis reminded the jury of the psychiatrists' diagnoses that Waters suffered from paranoid schizophrenia and of his need for medication—the missing "crutch that he'd been using to keep himself under control." *Id.* at 1346. Davis argued that Waters' failure to take the prescribed drug was his undoing. "That let him come unraveled. That let him become a prisoner to the forces of evil that took charge of that poor, human mind that was trying without success to direct his footsteps." *Id.* at 1346–47. Davis went on to emphasize the remorse and "great tearfulness—a great emotional upset," *id.* at 1347, that followed Waters' realization that he had probably killed the two women.

After this very sympathetic portrayal of his client, Davis proceeded to present what the majority terms "a request to allow a specimen to be studied." I juxtapose the section of the argument reproduced by the majority and the immediately preceding section, because I fail to understand how anyone could look at the argument as a whole and still conclude that "Davis essentially gave the jury two choices: (1) keep Waters alive so that those interested in mental illnesses could conduct experiments upon him and study him, or (2) put Waters to death." First, the section not included in the majority opinion:

I was interested in what [prosecution rebuttal witness, psychologist] Dr. [Gerald] Lower, the head of our Mental Institution there at Georgia State Hospital had to say about the drugs that are used

to treat schizophrenic patients.. You know, he said—I said "How early do they date back to?" "Oh, I think to the fifties, to the fifties." All right. We've got a disease here that is brought, been brought out into evidence that you can't see, you can't hear it, you can't smell it, you can't feel of it, none of your senses divulges its presence...." You cannot find the source of it. But lo and behold, our medical scientist and our pharmaceutical profession in the fifties came up with a drug that had an effect on that disease. Now that was a major development in our society. It's a major development that's felt every day by almost every family that you can think of, including the family no doubt of some of you who are sitting on this Jury. That development of controlling that type of a disease with a drug. Do you know what would have happened to Kelly Waters twenty-five years ago had he walked into that Mental Clinic in Waycross, ... if he'd walked up to a doctor or psychiatric practitioner of some kind and told them what he said, "I feel uneasy; I feel anxious; I feel nervous; I feel like I'm going to kill somebody." *He would have been committed. And this would never have happened. That's one of the bad side effects of having drugs that treat diseases like this, I say to you. It's one of the penalties we have to pay.* What did happen? First, it must have happened in Dr. Wiley Lewis' office because he immediately, well, "I've got a man here very upset. I don't want him to shoot anybody. I don't want him to go off his rocker. I don't want something bad to happen. I'm going to give him some Thorazine, an anti-psychotic drug." So he did. It straightened him out to some extent. He made it all right a few months, but then he got back in trouble again with his own mental disturbance and went to the Clinic in Waycross. What did they do: We'll put you on another drug that's been found since Thorazine, Mellaril, another anti-psychotic drug that had come along newer. The doctors must have said "Oh boy, we've got a new pill. Science is magic. Science can cure anything." Yes, science

can, if you continue to take it and if they monitor you, the medication very closely, and if you do exactly what you're supposed to do, you won't get locked up. You won't kill anybody. It won't happen. But if you don't take it like you're supposed to, or if it doesn't act just like it's supposed to, if you withdraw from it, goodness knows what'll happen. *That's the kind of ogre that exists and lives in our society today, not just in this case but in others. But this is a prime example of what can happen and what did indeed happen in this case.*

. . . .

So, I say, that *if it weren't for the pills,* if it weren't for our worship of the magic that the medical profession attaches to these pills, and that we as lay people, non-medical people attach to them, and *if it weren't for the fact that we hate for our Mental Hospital to get any more crowded than they already are, and if it weren't for the fact that we want to have people walking around in society if we can permit them to, if that hadn't have occurred in our society in the last twenty-five years, this crime would never have occurred.* Would never have occurred.

*Id.* at 1349–53.

Immediately thereafter, Davis presented the portion of the argument that the majority reproduces:

Can any good come out of this case? I'll say it can. I'll say the good that can come out of it would be this. We know what happens to a case similar to Kelly Waters when he refrains from taking drugs. We've *found out to our sorrow,* to the utter shame of the County, to that event which brought so much sadness to the wife, to the families of the victims in this case, to that occasion which brought so much sadness to the family of the Defendant in this case. We found out what would happen. I say if he is allowed to serve a life, a sentence of life imprisonment, he is a living subject that can be studied, that upon whom the effects of drugs can be determined with more certainty than it can be now. He is a prime case of what can happen if he doesn't take drugs and what steps may

be needed by society to ensure that a man in his boots needs to take drugs and needs to be put under such circumstances as you either know he's on drugs or else he's in a condition where, where nothing, no harm can come from him if he refrains from taking them. *You're going to make him responsible for taking them? Well, he's a nut to start with....  You can't depend on that.* But in his case, you can.  In his case, he's an ideal subject for the medical profession to say, all right, here is a man, called to God one day, called to a pistol and handcuffs the next day.  He's got that kind of split personality.  He doesn't know whether to serve the Lord or serve the Devil.  He doesn't even know whether he wants to be a person or not.  We'll take him.  We'll experiment with him.  We'll find out more about what can, the limits of activity in his case.  We'll use him for the good of society, so that an offence of this nature will not be repeated. *That's the human thing to do in this case.*  It's the socially advisable thing to do.  I agree this sort of thing excites the basest emotions I suppose that can be excited in the human breast; revenge, lack of mercy, all of those kinds of emotions are excited in the mind of any normal person that heard this evidence.  Of course, it is.  But what is the *socially acceptable, merciful, biblical, Christian thing to do here? I say don't kill him.  Don't rub him out.  Don't put him out of existence.*  Keep him.  Study him.  Learn about him.  Keep him so he can't do anybody else any harm.  Maybe from the result of his continued life, the results will make, the results of continued examination of him and a study of him will make it possible that the lives of more innocent people will not be sacrificed.  I ask you to consider that. *Id.* at 1353–55.  Davis concluded by appealing to the jurors to "let this man continue to live in the interest of serving, *doing your duty as an enlightened citizen* facing up to the tremendous responsibility that the law vests upon you in this case." *Id.* at 1355.

Davis did indeed suggest to the jury that Waters might serve as a useful case study.

But, even putting aside the opening portion of his argument where he emphasized Waters' personal torment and his remorse, Davis' history of how paranoid-schizophrenic patients have been treated by the medical profession—and dealt with by society—did more.  Davis told the jury that society has made a choice: patients who would once have been committed to mental institutions are now released among the general population.  The medical and pharmaceutical professions have made that choice possible by developing drugs to control such patients and minimize the likelihood of their doing harm to others.  The patients are under control, however, only if they take the medicine they need.  A patient may fail to do so for many reasons; as Davis suggested, such a patient is severely disturbed to begin with and cannot always be trusted to take the medicine without which he becomes a danger to himself and to others.  But society has not merely decided to reduce the population of mental institutions; it releases medicated patients without at the same time establishing programs to guarantee that the patients remain medicated.  So we have, in effect, made another choice: we will allow severely disturbed people to live among us, and while we will *prescribe* drugs to render them less dangerous, we will not oversee their continued use, although we know that not all patients will remain medicated at all times; therefore, *we must accept the damage they do when they fail to keep themselves medicated.*  The thrust of Davis' argument was that the psychotic, unmedicated Waters was not solely responsible for his actions; a society that no longer commits such persons to institutions but chooses instead to medicate them and then *fails to follow up and guarantee continued medication* bears much of the responsibility when the patient loses control and commits a violent act.

Davis' argument began with a reminder of Waters' mental illness, his personal torment, and his remorse.  It ended with a plea for Christian mercy and coupled the plea with a way for the jurors to salvage some shred of good from a tragic chain of events, a chain in which the jurors themselves were remote participants as mem-

bers of a society that has made its choice. I see nothing dehumanizing in that appeal. Indeed, I regard Davis' argument and the entire strategy that led up to it as not only reasonable but also persuasive. Whereas the majority seems to be shocked at the approach which Davis took, I am astonished that that approach did not succeed in persuading at least that "one juror" Davis was hoping to reach.

Because I believe that Davis took a difficult case, fashioned a promising defense, and presented his theory commendably, I must strongly dissent from the majority's holding that Davis rendered constitutionally ineffective assistance of counsel with respect to his client's sentence.